UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| **BILLIE PAMELA BAKER-REDMAN,** | **CIVIL ACTION NO. 5:21-24-KKC-MAS** |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| **PREMISE HEALTH EMPLOYER SOLUTIONS, LLC,** | |
| Defendant. | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on defendant Premise Health Employer Solutions, LLC (Premise)'s motion for summary judgment. (DE 16). For the following reasons, the Court will GRANT the motion.

I.

This action arises out of an employment dispute. Plaintiff Pamela Baker-Redman is a registered nurse. Premise is a corporation that provides healthcare services to third-party clients. In September 2019, Premise hired Baker-Redman to work part-time as the on-site nurse at a contract site—a Smucker's plant in Lexington, Kentucky (the Client). (DE 20 at 1). Baker-Redman served as the sole medical provider for the Client and her typical duties included, but were not limited to, screening new hires, administering vaccinations, conducting urinalysis, audiogram and spirometry work, keeping and organizing medical records, dealing with employee injuries, and maintaining the on-site clinic. (DE 16, #5 at 68-75). Baker-Redman performed these duties at the Client's plant and never worked remotely during her employment. (*Id.* at 4). Though there is some

evidence that Baker-Redman had a strained relationship with the Client from the start (see DE 16, #3 at 1), Baker-Redman's tenure was largely uneventful from September 2019 to March 2020.

The parties essentially agree that the events underlying this action began with the COVID-19 pandemic in March 2020. It was an unusual time for most businesses—the Client included. According to both parties, there was some initial confusion surrounding the implementation of safety measures between the Client, Premise, and Baker-Redman. Premise began implementing its own COVID guidance in mid-March—before the Client took its own action. (DE 16 at 4). Soon after, Baker-Redman became frustrated with the Client's response to the pandemic, voicing her disagreement with various protocols and procedures. (DE 20 at 2-3).

From mid-March to the end of the month, Baker-Redman and Premise Director of Client Operations Rebecca Fisher exchanged numerous emails and text messages regarding the COVID procedures at the Client's plant. Fisher routinely checked up on Baker-Redman and conveyed updated COVID guidance, including information on masking, distancing, and signage. (*See* DE 20, #s 7-9). During this time, Baker-Redman expressed her concerns about the Client's COVID response—much of which focused on Baker-Redman's dissatisfaction with the Client's Human Resources Director Becky Shelton. Baker-Redman and Shelton were at odds over various COVID measures, including temperature screening protocols, social distancing, and tracking and logging of employee health data. (*See* DE 16 at 4-7).

These disagreements culminated in a handful of specific incidents at the end of March and beginning of April. According to Fisher, on March 31 Baker-Redman expressed her frustration during a Zoom meeting with Premise staff. Fisher stated that Baker-Redman's actions were "unprofessional and inappropriate." (DE 16, #3 at ¶ 8). A couple of days later, Baker-Redman voiced disagreement with the Client's decision to have a third-party contractor take over employee

temperature screenings and clashed with the Client over its insistence that she participate in them (as opposed to logging her own temperature in the COVID questionnaire). (DE 16, #5 at 117-24). Baker-Redman expressed her frustration to the Client and to Fisher, but eventually told Shelton that she would comply. (*Id.* at 123-34). During this time, Baker-Redman claims the Client discouraged her use of particular protective gear when interacting with employees, as it "sent a bad message." (*Id.* at 124).

On April 2, Baker-Redman made an official request to work from home. Baker-Redman reiterated her complaints about the way the Client and its employees were handling the COVID safety measures. (DE 20, #12 at 1). She stated that she was over 60 years old and had been dealing with asthma since childhood. (*Id.*). Further, she stated that her husband had problems with bronchitis and had, at some point, undergone open heart surgery. (*Id.*) Baker-Redman requested to work from home "until this virus storm passes." (*Id.*) She also submitted a letter from her physician, who stated that Baker-Redman had "multiple high-risk conditions [and] a family member with serious chronic health conditions" and would "highly benefit from being able to work from home." (*Id.* at 2). On April 6, Baker-Redman followed up on her request (DE 20, #13).

On the same day, Fisher discussed Baker-Redman's request with Premise's HR department and also talked to the Client about some of the issues it had with Baker-Redman's performance. Ultimately, Premise decided that it could not accommodate Baker-Redman's request to work from home. (DE 16, #17). According to Premise HR Business Partner Cara Siegel, Premise determined that, as the only on-site provider for the Client, Baker-Redman could not perform the essential functions of her job from home. (*Id.* at ¶ 3). Premise instead offered her a period of leave. (*Id.*). Additionally, due to the complications between Baker-Redman and the Client, Premise decided to implement a Performance Improvement Plan (PIP) if Baker decided to forgo leave and return to

work in-person. (*Id.* at ¶ 4). Fisher notified Baker-Redman of the decision to deny her remote work request and potentially implement the PIP the next day. (DE 16, #1 at 13).

On April 7, the Client's Plant Manager told October Riggenbach, Premise Health's Associate Vice President of Operations, that the Client did not want Baker-Redman to return to work at the plant. The Client cited issues with Baker-Redman's performance and attitude, stating that she was not the right fit for the position. (DE 16, #19 at ¶ 3). Specifically, the Client said that Baker-Redman was frequently late, left work early, refused to have her temperature checked, refused to perform simple tasks, and threatened lawsuits. (DE 16, #20). On April 8, Premise terminated Baker-Redman's employment.

## II.

Baker-Redman asserts three claims: (1) failure to accommodate in violation of the Kentucky Civil Rights Act, KRS 344.040; (2) retaliation under 42 U.S.C. § 12, 203 and KRS 344.280; and (3) breach of contract. Premise seeks summary judgment on all three claims.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court must "determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d

587, 592 (6th Cir. 2001). If the evidence presented in opposition to summary judgment is merely colorable, or is not significantly probative, then summary judgment is proper. *Anderson*, 477 U.S. at 249–50.

### III.

### A. Failure to accommodate

Baker-Redman's first claim is that Premise violated the Americans with Disabilities Act and the Kentucky Civil Rights Act by refusing her a reasonable accommodation as a qualified individual with a disability pursuant to KRS 344.040(1).

The Kentucky Civil Rights Act prohibits discrimination against "a qualified individual" with a disability and defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." KRS 344.040(1); 42 U.S.C. § 12112(b)(5)(A). In order to establish a prima facie case for failure to accommodate, Baker-Redman must show that (1) she was disabled within the meaning of the ADA; (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation. *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). If she can establish a prima facie case, then the burden is on Premise to demonstrate that Baker-Redman could not reasonably be accommodated, because the proposed accommodation would impose an undue hardship on the operation of its programs. *See Parks* 607 F. App'x at 519. Because the language of the Kentucky Civil Rights Act mirrors the language of the ADA, 42 U.S.C. § 12101, et seq., the Court can rely upon ADA jurisprudence when analyzing disability discrimination claims brought under Kentucky

law. *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 164 (6th Cir. 2005) (citing *Brohm v. JH Properties*, Inc., 149 F.3d 517, 520 (6th Cir.1998)).

Proof of disability is a threshold requirement for any failure to accommodate claim. The parties dispute whether Baker-Redman was a qualified individual with a disability under the ADA. Baker-Redman offers various pathways through which she could satisfy this initial prong. But the Court will not decide whether Baker-Redman is a qualified individual due her medical conditions, whether Premise merely regarded her as disabled, or whether her associational disability argument has merit. There is no need, as her prima facie case fails in a much more obvious way. As an on-site nurse with in-person responsibilities, she could not refuse to work on-site and still be qualified for the position. Further, Baker-Redman's proposed accommodation was unreasonable and would have placed an undue hardship on Premise's operations.

Under the ADA, Baker-Redman must be able to perform the essential functions of her job with or without reasonable accommodation. 42 U.S.C. § 12111(8). A "reasonable accommodation" may include "job restructuring [and] part-time or modified work schedules." *Id.* at § 12111(9)(B). But an accommodation that removes an "essential function" from the position is per se unreasonable. *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998). The idea that regularly attending work on-site is essential to most jobs aligns with the text of the ADA. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) ("Regular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones."). "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (internal citations removed).

No matter how the Court views the issue—as a question of qualification as to Baker-Redman's prima facie case or as a question of reasonableness as to Premise's rebuttal—the dispositive question is this: was being on-site an essential function of her job? See *Ford Motor Co.*, 782 F.3d at 763. ("In failure-to-accommodate claims where the employee requests an accommodation that exempts her from an essential function, the essential functions and reasonable accommodation analyses [ ] run together. One conclusion (the function is essential) leads to the other (the accommodation is not reasonable).") (internal citations and quotations removed). The answer, based on the record before the Court, is unequivocally yes.

Baker-Redman's job responsibilities included screening new hires, administering vaccinations, conducting urinalysis, audiogram and spirometry work, keeping and organizing medical records, dealing with employee injuries, and maintaining the on-site clinic. (DE 16, #5 at 68-75). All of these activities were performed in-person. (*Id.* at 69). She was the sole practitioner at the Client's clinic. (*Id.* at 79). According to Baker-Redman herself, in the months before COVID, "[Client employees' we in and out [of the clinic] all during the day." (*Id.*). At no time during her tenure with the Client did she work remotely. (*Id.* at 84).

When the COVID pandemic hit in March of 2020, the Client's plant continued in-person operation and never shut down. (*Id.* at 93). According to Fisher, "the on-site attendance requirement for [Baker-Redman's] position as a registered nurse at Client's plant did not change, despite the pandemic." (DE 22, #2 at ¶ 3). Further, "on-site care is the sole service Premise Health gives its customers. That service cannot be performed remotely. If [Baker-Redman] could not attend work at Client's site, Premise Health did not have work for her to do at home." (*Id.* at ¶ 5).

In support of her position that she could have performed her duties remotely, and thus in-person attendance was not an essential function of her job, Baker-Redman cites only *Mosby-*

*Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595 (6th Cir. 2018). There, the court held that the plaintiff had presented sufficient evidence supporting a finding that she could perform all the essential functions of her job remotely and refused to disturb a jury verdict in her favor. *Id.* at 604. But the facts surrounding Mosby-Meachem's accommodation request differ significantly from those surrounding Baker-Redman's. For one, Mosby-Meachem was but one attorney at a company where employees often worked remotely. *Id.* at 600. Mosby-Meachem had herself worked remotely in the past. *Id.* By contrast, Baker-Redman was the sole medical provider at the Client's plant and had never been allowed to work remotely in the past. Mosby-Meachem's duties did not revolve around patient/client/employee interaction—in fact she had never even participated in a trial in nearly a decade with the company (she mostly did labor and workers' compensation work). By contrast, Baker-Redman admittedly fielded Client employees all day, performing many tasks that common sense suggests could not be performed remotely (administering vaccinations, conducting urinalysis, attending to injuries, etc.). Moreover, Mosby-Meachem's requested accommodation was for a definite term. *Id.* By contrast, Baker-Redman asked to work remotely "until this virus storm passes." The *Mosby-Meachem* court found that in-person attendance was not an essential function of her job specifically because "she had already demonstrated her ability to work remotely without issue [and] her disability—and corresponding accommodation—was for a limited time rather than an indefinite period." *Id.* at 605.

Though the question of whether in-person attendance is an essential function of a job is necessarily fact-dependent, the Circuit's decisions leave no doubt that Baker-Redman's in-person attendance at the Client's plant was essential. *See Popeck v. Rawlings, Co., LLC*, 791 F. App'x 535, 539 (6th Cir. 2019) (in-person attendance an essential function for healthcare auditor who always performed her job in-house, in contrast to other employees who had previously worked

from home); *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 392 (6th Cir. 2017) (call center employee's accommodation claim failed because employer showed that employee's job duties could not be performed without on-site attendance). Courts addressing this issue have noted, however, that "on its own . . . full-time presence at work is not an essential function." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 856 (6th Cir. 2018). An employer must be able to "tie time-and-presence requirements to some other job requirement." *Id.* Here, Premise can easily link the feasibility of Baker-Redman's daily duties to her in-person attendance. Common sense is part of this analysis (*see Ford Motor Co.*, 782 F.3d at 762–63), and it suggests that a sole medical provider for a factory cannot administer vaccinations, conduct urinalysis, audiogram and spirometry work, properly assess employee injuries, and generally maintain the on-site clinic from her own home. Premise says that she could not. Baker-Redman only asserts, without evidence, that her own assessment of which duties were essential, and which could be performed remotely, creates a genuine issue of fact. It does not.

Further, this is not a "medical leave" case in which the employee requests a defined period of time off "to recover from illnesses or medical procedures." *See King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 561 (6th Cir. 2022). Baker-Redman requested to change her schedule from 100% in-person to 100% remote for an indefinite amount of time. This is unreasonable. *See id.* at 562 (noting that even in medical leave cases, "requests for indefinite leave are likely unreasonable"). Baker-Redman bears the burden of showing that a proposed accommodation "seems reasonable on its face." *Blanchet v. Charter Commc'ns*, LLC, 27 F.4th 1221, 1229 (6th Cir. 2022). She provides no evidence of this. Even if she could, Premise has demonstrated that the accommodation would eliminate an essential job requirement, and that is enough. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007).

All considered, "regular and predictable on-site job attendance was an essential function (and a prerequisite to perform other essential functions)" of Baker-Redman's nursing job. *See Ford Motor Co.*, 782 F.3d at 761. Accordingly, Baker-Redman's claim fails because she cannot establish a prima facie case. Or it fails because Premise carries its burden to establish the requested accommodation was unreasonable. Premise is entitled to summary judgment on the failure to accommodate claim regardless.[1]

### B. Retaliation

Baker-Redman also claims that her termination was a retaliation to her requested accommodation, in violation of the ADA (42 U.S.C. § 12203) and KRS 344.280. Premise argues that Baker-Redman cannot establish her prima facie case or, even if she can, there was a non-discriminatory motive for Baker-Redman's termination and she has failed to meet her burden that the reasoning was pretextual.

To make a prima facie case of retaliation, Baker-Redman must show that (1) she engaged in protected activity under the ADA; (2) the defendant knew of the protected activity; (3) the defendant took an adverse action against the plaintiff; and (4) there was a causal connection between the adverse action and the plaintiff's protected activity. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020) "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). If Baker-Redman succeeds, the burden shifts to Premise to show it had a legitimate, non-discriminatory basis for terminating her employment. *Kirilenko-Ison*, 974 F.3d

---

[1] Baker-Redman also alleges that Premise failed to engage in the required interactive process once she requested her accommodation. If the employee fails to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job, she cannot survive summary judgment on an interactive-process claim. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017). Accordingly, the Court will not analyze this issue.

at 661. If Premise succeeds, the burden then shifts back to Baker-Redman to show, by a preponderance, that Premise's stated reasons for termination "were not its true reasons, but were a pretext for retaliation." *Id.* (internal citations removed).

As to Baker-Redman's prima facie case, Premise argues that she did not engage in a protected activity and therefore Premise could not know of the protected activity. But under the ADA, requests for accommodation are protected acts. *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013); *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015) ("Both this circuit and most others agree that requests for accommodation are protected acts."). Because there is sufficient evidence for a jury to conclude that Baker-Redman requested an accommodation and Premise was aware of the request, the retaliation claim meets this initial burden. Because the parties do not dispute that Premise took an adverse employment action against Baker-Redman, the only remaining dispute as to her prima facie claim is whether there is a causal connection between the protected activity and the adverse action.

"To show causation, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct." *Kirilenko-Ison*, 974 F.3d at 664. Because the burden to show a prima facie case is not an onerous one, in many cases "an adverse employment action [that] occurs very close in time after an employer learns of a protected activity [creates] a temporal proximity between the events significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 305 (6th Cir. 2012) (internal quotations and citations removed). While there is no bright-line cutoff for temporal proximity, "the causal connection element [is typically] satisfied [when] the adverse employment action occurred within a matter of months, or less, of the protected activity." *Gambill v. Duke*

*Energy Corp.*, 456 Fed.Appx. 578, 589 (6th Cir.2012) (collecting cases). Here, Baker-Redman requested a remote work accommodation on April 2 and was terminated on April 8. This temporal proximity, viewed alone, could establish Baker-Redman's prima facie case in many circumstances.

But close temporal proximity only suffices in certain circumstances. An intervening cause occurring between the protected activity and the adverse employment action severs the causal chain and in fact "dispels any inference of causation." *Jones v. Vilsack*, 861 F. App'x 58, 61 (6th Cir. 2021); *see also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) (holding an employee's refusal to work between his lodged complaint and his termination an intervening event that gave his employer a legitimate reason to discipline him, thus dispelling any inference of retaliation); *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (holding that an intervening "obviously nonretaliatory basis" for an adverse action is evidence negating temporal proximity); *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) (holding that a retaliation claim failed, even when a relatively short time elapsed between the protected activity and termination, because the employer had an intervening reason to fire the employee). A plaintiff faced with an intervening cause cannot satisfy the causal element of a retaliation claim when they provide no evidence aside from temporal proximity linking the protected activity to the adverse action. *See id.*; *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 451 (6th Cir. 2020).

Ultimately, Baker-Redman must provide proof that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Jones*, 861 F. App'x at 61. In other words, at the summary judgment stage she must provide enough evidence of a retaliatory motive "such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for [her] engagement in protected activity." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010).

Baker-Redman has not provided enough evidence of a causal connection to meet her prima facie burden. On April 2, she requested remote work. On April 8, she was terminated. The temporal proximity between these events could certainly suggest that Premise had a retaliatory motive in firing her—absent any other evidence. But on April 7, the Client emailed Premise Vice President of Operations Riggenbach and explicitly asked that Baker-Redman "not return to the Lexington Facility." (DE 16, #20). The Client listed four specific reasons why it was "unsatisfied with the return on [its] investment due to the lack of [Baker-Redman]'s attention and services." (*Id*). The Client stated that Baker-Redman was not present during her posted hours, frequently arrived late and left early, refused Client COVID protocol, and failed to work collaboratively with other Client employees, among other concerns. (*Id.*). According to Riggenbach, the Client did not know about Baker-Redman's accommodation request prior to sending this email. (DE 22, #3 at ¶ 3). When the Client told Premise that it was unsatisfied with Baker-Redman's performance and no longer desired her services, that triggered an intervening cause which dispelled any inference of causation between the protected activity and the adverse employment action. *See Jones*, 861 F. App'x at 61.

Baker-Redman cites *Barret v. Lucent Technologies, Inc.*, 36 Fed.Appx. 835 (6th Cir. 2002) and *Hafford v. Seidner*, 183 F.3d 506 (6th Cir. 1999) for the proposition that the temporal proximity between her accommodation request and her termination is sufficient to infer causation. But in both cases, the courts held that other facts negated any inference of causation arising out of temporal proximity. In *Barret*, there was evidence that the plaintiff was terminated for job performance issues. *See* 36 Fed.Appx. at 843. And in *Hafford*, the temporal proximity argument was "tenuous" and failed because there was evidence of intervening disciplinary issues and the plaintiff did not provide any additional evidence of retaliation apart from the temporal proximity between protected act and termination. *See* 183 F.3d at 515. These cases, as well as other existing

caselaw dealing with retaliation, stand for the proposition that temporal proximity *can be* sufficient to establish causation but is not enough when coupled with clear evidence of intervening causes and a lack of proof of the employer's pretextual motivations.

Even if Baker-Redman could meet her prima facie burden, Premise is entitled to summary judgment because Premise has provided a legitimate, non-discriminatory basis for terminating her employment (the Client's request based on poor performance) and Baker-Redman has not provided enough evidence of pretext to raise a genuine issue of fact. To prove pretext, a plaintiff must show that the employer's proffered reason was false and that retaliation was the real reason for termination. *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 503 (6th Cir. 2013). A plaintiff may prove a reason false by showing that it (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) was insufficient to motivate the employer's action. *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

Ultimately, to survive a motion for summary judgment, a plaintiff "retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally [retaliated] against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). Baker-Redman has not met that burden. She offers two main arguments for pretext. The first is that Premise mischaracterizes her relationship with the Client and promotes contradictory narratives surrounding the friction over COVID procedures at the plant. But the record shows that Baker-Redman and the Client clashed, significantly, during the nascent stages of the pandemic. Moreover, the record includes communications between Premise and the Client specifically discussing Baker-Redman's issues at work. Baker-Redman offers no evidence to the contrary and instead agrees with Premise's assertions that there was significant discord between her and the Client. (*See* DE 20 at 16-17).

The second argument is that the PIP is evidence of pretext because, "if the Defendant planned to remove the Plaintiff from the plant, then why did Premise tell her . . . that when she returned to work she would be on a PIP[?]" (*Id.* at 16). This argument fails because the obvious answer is that Premise planned to work with Baker-Redman to improve her job performance because they planned to retain her. And that all changed when the Client told Premise that it no longer wanted Baker-Redman to serve as the on-site nurse for its facility. Fisher offers this narrative of the final days of the employment relationship:

> Premise Health sought to place Plaintiff on a PIP because of her inability to get along with Client's employees. Premise Health prepared the PIP for Plaintiff [(on April 6, *see* DE 16, #18)] and scheduled times to meet with her on April 7 at 12:30 to deliver the PIP, but Plaintiff did not report to work for her scheduled shift. Later that same day, Premise Health received an email from Client informing Premise Health that it did not want Plaintiff to come back. On April 8, 2020, Plaintiff was asked not the return to work.

(DE 22, #2 at ¶ 5). And Premise HR Partner Cara Siegel stated that she offered Baker-Redman the ability to take paid leave in lieu of working from home and "discussed Plaintiff's recent problematic interactions with Client's employees and her general attitude since the start of the pandemic with Ms. Fisher." Siegal and Fisher "concluded that, when Plaintiff returned to work, she needed to be placed on a PIP." They then put together the PIP "if she opted to return to the plaint rather than accepting the proposed leave accommodation." (DE 16, #17 at ¶ 4). After they created the PIP, the Client informed Premise of its dissatisfaction with Baker-Redman. and its desire that she not return to work. Baker-Redman presents no actual evidence to dispute this timeline or this reasoning. The ultimate inquiry is "did the employer fire the employee for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) Baker-Redman must provide sufficient evidence that Premise's stated reasoning is false. She does not. Accordingly, her retaliation claim fails as a matter of law.

## C. Breach of contract

Kentucky law presumes an at-will employment relationship "unless the parties otherwise agree," *McDonald v. Webasto Roof Sys., Inc.*, 570 F. App'x 474, 477 (6th Cir. 2014) (citing *Noel v. Elk Brand Mfg. Co.*, 53 S.W.3d 95, 98 (Ky. Ct. App. 2000)). This means that, absent some agreement to the contrary, an employer may discharge an employee "for good cause, for no cause, or for a cause that some might view as morally indefensible." *Id.* (quoting *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). Even if there is some sort of agreement as to employment, "an agreement for at-will employment does not create an enforceable contract, and thus, a breach of contract action to enforce it will not lie." *Clemans v. Nat'l Staffing Sols., Inc.*, 459 F. Supp. 3d 842, 845 (E.D. Ky. 2019). A memorandum reciting the terms of an employment offer, without other evidence of a contractual relationship, does not create an enforceable contract. *Street v. U.S. Corrugated, Inc.*, No. 1:08-CV-00153, 2011 WL 304568, at *5 (W.D. Ky. Jan. 25, 2011).

The only evidence of any employment agreement on record is an offer letter signed by Baker-Redman. The letter recites the terms of employment and explicitly states that the employment "with Premise Health and all company-affiliated facilities is considered 'at will,'" meaning that either the company or [the employee] may terminate this employment relationship at any time with or without cause or notice." (DE 16, # 4 at 2). Baker-Redman understood that she was an at-will employee and stated that she did not have a contract with Premise. (DE 16, #5 at 72-73).

Moreover, Baker-Redman did not defend—or even mention—her breach of contract claim in her response to Premise's motion for summary judgment. This constitutes an abandonment of this specific claim. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases for the proposition that "a plaintiff is deemed to have abandoned a claim when a

plaintiff fails to address it in response to a motion for summary judgment"). Premise is entitled to summary judgment on the breach of contract claim.

## IV.

Because Baker-Redman has not presented sufficient evidence upon which a reasonable jury could find in her favor, Premise is entitled to judgment as a matter of law on all existing claims. Accordingly, the Court hereby ORDERS that Premise's motion for summary judgment (DE 16) is GRANTED.

This 12th day of January, 2023.

*signature*

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY